UNITED STATES of America

v.

**Dennis BROCCOLO, Defendant.**

**No. 91 Cr. 902 (SWK).**

United States District Court,
S.D. New York.

July 9, 1992.

---

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Nelson A. Boxer, Asst. U.S. Atty., for Government.

Green & Willstatter, White Plains, N.Y. by Theodore S. Green, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The indictment in this case charges defendant Dennis Broccolo with six counts of wire fraud (Counts One through Six), in violation of 18 U.S.C. § 1343, one count of unauthorized use of an access device with the intent to defraud (Count Seven), in violation of 18 U.S.C. § 1029(a)(2), and one count of making a false oath in a bankruptcy proceeding (Count Eight), in violation of

18 U.S.C. § 152. Defendant now moves for an order (i) pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure, severing Count Eight from Counts One through Seven of the indictment, (ii) compelling the Government to disclose a witness list in advance of trial, and (iii) pursuant to Rule 12 of the Federal Rules of Criminal Procedure, suppressing post-arrest statements attributed to defendant, on the ground that they were involuntarily made and obtained in violation of his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1] With respect to defendant's suppression motion, the Government consented to an evidentiary hearing which was conducted on March 4 and 6, 1992.

## BACKGROUND

The charges in the indictment involve six corporations, several of which the Government alleges to have been fictitious. Counts One through Six of the indictment allege that the defendant committed wire fraud by telefaxing applications for Staples[2] credit cards which contained false and fraudulent representations concerning the six corporations: namely, Crystal Commercial Credit Corporation (Count One), Crystal Leasing Corporation (Count Two), Crystal Enterprises Corporation (Count Three), Crystal Construction Corporation (Count Four), Commercial Development Corporation (Count Five) and DAC Medical Data Services (Count Six). Count Seven alleges that the defendant used an unauthorized access device with the intent to defraud, namely, the Staples credit card issued to DAC Medical Data Services. Count Eight alleges that the defendant made a false oath with the intent to defraud in his Chapter 7 Bankruptcy Petition; namely, on May 3, 1990, he fraudulently represented to a United States Bankruptcy Court that he had not engaged in any business activity during the preceding six years.

Subsequent to the return of the indictment, the Government provided defendant with extensive discovery, including a copy of (1) the defendant's written waiver of rights, executed on July 29, 1991, (2) a Federal Bureau of Investigation ("F.B.I.") Form 302, dated August 7, 1991, describing the defendant's oral statement to F.B.I. Special Agent Michael Harkins on July 29, 1991, and (3) the defendant's written statement, dated July 29, 1991, which included a second written waiver of rights executed by defendant. Additionally, in response to defendant's discovery demand the Government provided defendant with copies of the relevant credit card applications, charge slips, delivery manifests, and account statements for the Staples credit cards as well as documents pertaining to defendant's bankruptcy proceeding. In response to defendant's request for a bill of particulars, the Government provided particulars of the fraudulent statements alleged in Counts One through Six, the amount of account charges with respect to Count Seven, and, with respect to Count Eight, the businesses the Government contends the defendant engaged in during the six years preceding May 3, 1990. The Government, however, declined to produce a list of the witnesses it intends to call at trial and the witnesses' business or home addresses, indicating that any information required to be disclosed would be provided in advance of the witnesses' testimony pursuant to its obligations under the Jencks Act. *See* 18 U.S.C. § 3500.

In support of his motion to suppress oral and written post-arrest statements, defendant submitted an affidavit in which he avers that prior to interrogation, F.B.I. Special Agent Mattiace stated to him: "We know all about you. Either you cooperate or all bets are off," *see* Affidavit of Dennis

---

1. The Government did not oppose defendant's pre-trial motion seeking issuance of subpoenas *duces tecum,* and the subpoenas were issued by the Court.

2. Staples, a company that sells office furniture and equipment, issued credit cards financed by

Baybank Boston, N.A. *See* Government's Memorandum of Law in Opposition to the Defendant's Motion to Sever a Count in the Indictment, to Compel the Production of a Witness List, and to Suppress Statements Made by the Defendant ("Gov't Mem."), at 2 n. 1.

Broccolo, sworn to December 16, 1991 ("Broccolo Aff."), at ¶ 3, and that Special Agent Harkins told him that if he did not immediately cooperate he would lose the opportunity to do so. *Id.* at ¶ 4 ("I asked Agent Harkins for a lawyer and he again *implied* that I would lose the benefits of cooperating if I persisted in delaying the interrogation for the arrival of a lawyer" [emphasis added]). Defendant also claims that he was permitted to make telephone calls but, rather than telephone a lawyer, telephoned family members, "because [he] thought it was too late, since [he] had already made a statement," *id.* at ¶ 6, and signed waiver of rights forms, "involuntarily," only after Agent Harkins informed him that waiting for a lawyer would not be in his interests. *Id.* at ¶ 7.

At the suppression hearing,[3] the Government called three F.B.I. agents: Special Agents Michael Harkins, Joseph Keating and Chris Mattiace. Defendant neither testified nor presented evidence. The relevant facts adduced at the hearing are set forth below.

Defendant was arrested in the late afternoon on July 29, 1991, and was taken to an interview room at the F.B.I. New Rochelle field office. There, he was fingerprinted, permitted to wash his hands, given a soda, and advised of the charges against him. Tr. at 5, 49. At no time while in the interview room was defendant handcuffed. Tr. at 6, 49.

Agent Harkins raised with defendant the subject of his possible cooperation with the F.B.I., stating to defendant in substance that "if [he] wanted to cooperate [the agents] would be willing to listen and to interview him, [and] that his cooperation would be made known to the Assistant United States Attorney, and the court, which could possibly benefit him, but [that the agents] couldn't make any promises."

Tr. at 28–29. Defendant responded by stating that he wished to cooperate. Tr. at 29.

Agent Harkins then retrieved an advice of rights form[4] and advised defendant of his *Miranda* rights by reading aloud the *Miranda* warnings appearing on the form. Tr. at 6. Agent Harkins then permitted defendant to read the form himself. *Id.* Defendant read the form and stated that he worked for a lawyer, was taking paralegal courses, and understood his rights. Tr. at 6, 51, 76. Defendant then signed the form and, in response to questioning by the agents, made oral statements concerning the fraudulent conduct alleged in the indictment. Tr. at 9–11. Defendant also stated to the agents, and the agents understood, that Paul Squitieri, Esq., was defendant's attorney and had represented defendant in connection with his personal bankruptcy and the incorporation of Crystal Commercial Credit Corporation. Tr. at 20–24.

At 8:45 p.m., after the interview had proceeded for approximately one and one half hours, defendant requested that he be permitted to make a telephone call. He was permitted to do so and telephoned family members. Defendant informed them that he was "okay" and was being treated like a "gentleman." Tr. at 14, 55. After the telephone call, Agents Harkins and Keating resumed the interview. At approximately 9:15 p.m., the Agents adjourned for a dinner break, at which time Agent Keating brought pizza and soda into the interview room. Tr. at 14, 56. Defendant ate with the agents. *Id.*

After dinner, Agent Harkins asked defendant if what he had been telling the agents was truthful. Tr. at 56–57. Defendant responded that it was. Tr. at 57 Agent Harkins then asked defendant if he would be willing to make a written state-

---

**3.** References to the transcript of the suppression hearing conducted on March 4 and 6, 1992, are indicated by the notation "Tr."

**4.** The advice of rights form contains a provision entitled "Waiver of Rights," which provides as follows:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Gov't Exhibit "1."

ment, to which defendant responded he would. *Id.*

Agent Harkins then retrieved a second advice of rights form, identical to the first, again read defendant his *Miranda* rights from the form, and had defendant sign the form. *See* Gov't Exhibit "2." Defendant read and executed the form. Tr. at 16–17. Defendant then proceeded to dictate a statement which Agent Harkins copied down. Agent Harkins read aloud to defendant the entire statement and permitted defendant to read the statement himself. *Id.* Defendant then signed the statement. Tr. at 18.

At approximately 11:00 p.m., defendant requested permission to telephone his family and was permitted to do so. Tr. at 19, 58–59. He told them that he was going to be taken to the New Rochelle Police Department jail and either would be held overnight and released, or taken to White Plains. Tr. at 19. Defendant was subsequently committed to the custody of the New Rochelle Police. *Id.*

The agents credibly testified that at no time during the events of July 29, 1991, either before or after being taken into custody, did defendant request to speak with a lawyer, Tr. at 8, 44, 59, ask to telephone a lawyer, Tr. at 51, or indicate that he was uncomfortable. Tr. at 6.

## DISCUSSION

### I. Severance

Defendant contends that because Count Eight of the indictment concerns his personal bankruptcy petition, while Counts One through Seven allege "that he secured credit by exaggerating the extent of his business activities," joinder of Count Eight is improper since the offenses are not of the same or similar character. Defendant also contends that a severance is warranted since he has "important testimony to give" with respect to Count Eight but "a strong need to refrain from testifying" with respect to Counts One through Seven. Defendant's Memorandum of Law ("Def. Mem."), at 3–4.

### A.

Rule 8 of the Federal Rules of Criminal Procedure sets forth "a liberal standard for joinder," *United States v. McGrath,* 558 F.2d 1102, 1106 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978), and provides as follows:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Fed.R.Crim.P. 8(a). The Second Circuit has recognized the "important policy" underlying Rule 8(a), namely, "that of trial convenience and economy of judicial and prosecutorial resources—considerations of particular weight when the Government and the courts have been placed under strict mandate to expedite criminal trials...." *United States v. Werner,* 620 F.2d 922, 928 (2d Cir.1980) (citations omitted); *see also United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988) (Congress authorized consolidation in the belief that public considerations of economy and speed outweigh possible unfairness to the accused).

In the instant case, all counts of the indictment are "of the same or similar character," in that each alleges acts by defendant to fraudulently misrepresent (to Staples and Baybanks) and/or conceal his business activities (from the bankruptcy court and creditors). Moreover, each count of the indictment involves an act or transaction "connected together or constituting parts of a common scheme or plan."

In Counts One through Six, defendant is alleged to have committed wire fraud when he telefaxed to Staples corporate credit card applications for Crystal Commercial Credit Corporation, Crystal Leasing Corporation, Crystal Enterprises Corporation, Crystal Construction Corporation, Commercial Development Corporation and DAC Medical Data Service. Each application was signed by defendant, and, according to

the Government, fraudulently misrepresents the year in which each company was established, gross sales, net income, number of employees and other pertinent information. Count Seven alleges that defendant used a Staples credit card issued to DAC Medical Data Services with the intent to defraud.

Count Eight, which defendant seeks to sever, alleges that defendant made a false oath or affirmation in his Chapter 7 bankruptcy proceeding when he swore that he had not engaged in any business activity during the preceding six years when, in fact, he had engaged in business activity on behalf of, *inter alia*, Crystal Commercial Credit Corporation and Crystal Construction Corporation during that period. Simply put, in Count Eight defendant is charged with submitting a false oath or statement about the same companies he is alleged to have used to commit wire fraud.

In *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir.1990), the defendant was charged in an indictment with two counts of bank fraud and one count of perjury. The bank fraud counts were based on allegedly false representations and material omissions made by the defendant in applications for two loans, the proceeds of which were used to finance a commercial development project by a non-profit organization; the perjury count alleged that during the grand jury's investigation of consulting fees received by the defendant in connection with the project, the defendant testified falsely regarding his possession of a subpoenaed document. *United States v. Ruiz*, 894 F.2d at 502–24; *see also United States v. Ruiz*, 702 F.Supp. 1066, 1075 (S.D.N.Y.1989). The defendant moved to sever the perjury count. Recognizing that the alleged perjury did not occur during a specific investigation by the grand jury into the alleged bank fraud, the district court nevertheless denied the motion:

> The bank frauds in Count One and Two concern alleged misrepresentations which related to defendant's efforts to secure a loan to complete the Yankee Mall supermarket project. Part of the profits that Ruiz hoped to enjoy from that project would stem from a consulting agreement that Ruiz executed with the Alliance for Progress, the project's sponsoring organization. Count Three arose from a grand jury investigation into the defendant's possible misuse of his position, and related statements, with respect to that same development project. *Defendant's allegedly perjurious statements to the grand jury, therefore, concerned the defendant's scheme to maximize his personal gain from the Yankee Mall supermarket project, as well to cover any improprieties that scheme might involve.*

702 F.Supp. at 1076–77 (emphasis added) (footnote omitted). The Second Circuit affirmed, holding:

> the acts underlying the false statement and perjury counts have sufficient logical connection to warrant joinder in a single trial. All three relate to Ruiz's extrasenatorial activities through the Alliance. The false statement counts focused on Ruiz's attempt to procure financial support from Chemical Bank for proposed development at the Yankee Mall. Similarly, the perjury count focused on Ruiz's alleged attempts to mislead the grand jury about his attempts to secure Ethics Committee approval of his consulting fees from the Alliance projects. *The actions underlying all three counts were part of a common scheme or plan, and as all involved substantial alleged dishonesty, surely were 'of the same or similar character.'*

*United States v. Ruiz*, 894 F.2d at 505 (emphasis added); *see also United States v. Guariglia*, 757 F.Supp. 259, 263 (S.D.N.Y.1991) (court denied severance motion, finding, *inter alia*, that "the conduct charged in the two groups of counts not only is of a similar character—false statements, notwithstanding their [differing] subject matter, but is also 'connected together' ").

As in *Ruiz*, the false statement count here (Count Eight), is sufficiently related to the counts pertaining to the alleged scheme to defraud so as to form a common scheme or plan: the alleged false statement was an effort by defendant to cover any improprie-

ties that the scheme to defraud Staples might involve, *see United States v. Ruiz*, 702 F.Supp. at 1077, and of a character similar to that of the acts alleged in the fraud counts, in that all counts involve substantial alleged dishonesty. *See United States v. Ruiz*, 894 F.2d at 505.

Defendant's reliance on *United States v. Halper*, 590 F.2d 422 (2d Cir.1978), in support of his motion for a severance is misplaced. In *Halper*, the Court of Appeals reversed the conviction of a defendant tried for Medicaid fraud, and for evading taxes payable for the period during which the fraud was ongoing but otherwise having no demonstrable connection to the fraud. First, the court held that since the Government had conceded "that the sums charged in the income tax evasion indictment were not the same funds embraced in the Medicaid indictment," the counts charged in the two indictments were not "connected transactions." 590 F.2d at 429. Second, the court concluded that "evidence of the Medicaid fraud alleged in the indictment could not be used in a separate trial on the income tax invasion indictment," *id.* at 432, and, therefore, the two indictments were not "of similar character."

In the first instance, unlike the present case, *Halper* involved a Government motion, pursuant to Fed.R.Crim.P. 13,[5] to *join* trial of two indictments returned by two different grand juries. Also unlike the situation in *Halper*, the count defendant

seeks to sever from the instant indictment, Count Eight, charges an act so closely connected to those charged in Counts One through Seven as to properly be deemed one in furtherance of that fraudulent scheme; namely, submitting a false oath in furtherance of defendant's efforts to conceal the fraud charged in Counts one through Seven. Moreover, evidence concerning the fraudulent activities charged in Counts One through Seven would be admissible in a trial of Count Eight in order to prove the falsity of the sworn statement defendant submitted to the bankruptcy court.[6] Similarly, in a trial solely on Count Eight, evidence of the alleged fraudulent acts charged in Counts One through Seven would likely be admissible to establish a motive for defendant's false statement to the bankruptcy court, namely, to conceal the improprieties of his fraudulent credit card applications from creditors and the court. *See* Fed.R.Evid. 404(b); *United States v. Ruggiero*, 934 F.2d 440, 448–49 (2d Cir.1991) (evidence of subject of grand jury investigation—narcotics activity—admissible to prove defendant's motive for obstructing justice). In addition, defendant's statements contained in the applications which are the subject of Counts One through Seven are "statements" of the defendant, admissible to prove the falsity of defendant's statements to the bankruptcy court. *See* Fed.R.Evid. 801(d)(2)(A); *United States v. Sweig*, 441 F.2d 114, 118 (2d

---

5. Rule 13 of the Federal Rules of Criminal Procedure provides as follows:

> The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information....

Fed.R.Crim.P. 13. Accordingly, two indictments may be tried together under Rule 13 only if the offenses charged are (1) of the same or similar character, or (2) based on the same act or transaction, or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. *See Halper*, 590 F.2d at 428. Although reference is necessarily made to Rule 8(a) for such a determination:

> even of the offenses could have been joined in a single indictment under Rule 8(a), the trial court is not automatically free to order the indictments tried together under Rule 13—

'literal compliance with the Rule [governing joinder of offenses] is not necessarily final in cases where there is danger of confusion, or of unfair prejudice from the joinder.'

*Id.* (quoting *United States v. Gottfried*, 165 F.2d 360, 363 (2d Cir.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948)).

6. To prove that defendant's May 3, 1990 bankruptcy court statement was fraudulent, the Government would seek to introduce evidence that defendant was engaged in business on behalf of Crystal Commercial Credit Corporation and/or Crystal Construction Corporation during the six preceding years; such evidence would include defendant's applications for and use of Staples credit cards for Crystal Commercial Credit Corporation and Crystal Construction Corporation, which applications, among other things, state that the corporations had been "established" for five years and four years, respectively. *See* Gov't Mem., at 14.

Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) (district court's denial of motion to sever perjury count from conspiracy count affirmed because proof of the perjury count was admissible as a false exculpatory statement in conspiracy case and proof of conspiracy was admissible to show motive and wilfulness in perjury case).

### B.

Even though distinct offenses have been properly joined under Rule 8, the court may order separate trials or grant a severance under Rule 14, if the defendant will be unfairly prejudiced by the joinder. Rule 14 provides in relevant part:

> If it appears that a defendant ... is prejudiced by a joinder of offenses ... in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, ... or provide whatever other relief justice requires.

Fed.R.Crim.P. 14. In order to succeed on a motion under Rule 14, the defendant must show "not simply some prejudice" but "substantial" prejudice resulting from trial on all counts of the indictment, *see United States v. Werner,* 620 F.2d at 928–29, and such prejudice must be more than "solely the adverse effect of being tried for two crimes rather than one." *Id.* at 929.

■ Where a defendant contends that he would be prejudiced by a joint trial on the basis that if there were separate trials he would testify at one of them, the defendant must make a particularized showing concerning both the testimony he wishes to give as to some counts and the reasons for remaining silent on others, in order that the court may make an independent determination of whether the prejudice to the defendant outweighs the interests favoring joinder. *Id.* at 930 (quoting *United States v. Jamar,* 561 F.2d 1103, 1108 n. 9 (4th Cir.1977)); *see also United States v. Scivola,* 766 F.2d 37, 43 (1st Cir.1985); *Baker v. United States,* 401 F.2d 958, 977 (D.C.Cir. 1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970) ("defendant [must make] a convincing showing that he

has both important testimony to give concerning one count and strong need to refrain from testifying on the other"). "[A] mere unexplicated assertion" by a defendant that he would be prejudiced by a joint trial because at separate trials he would testify at one of them, simply "is not enough" to establish the substantial prejudice sufficient to warrant separate trials. *United States v. Werner,* 620 F.2d at 930.

Defendant here fails to make the requisite showing of substantial prejudice. Although defendant, according to counsel, "has indicated that the bankruptcy filing was prepared by his attorney ... and that he did not have knowledge or intent respecting the alleged misstatement [to the bankruptcy court]," Def.Mem. at 4, thereby providing some indication of the strategy defendant may employ to rebut the Government's proof on the elements of knowledge and intent, defendant, neither directly nor through counsel, affirmatively represents his present intent to testify as to these matters. In addition, defendant has failed to make any showing concerning the reasons for remaining silent with respect to Counts One through Seven. Moreover, even were defendant granted a separate trial on Count Eight of the indictment, evidence concerning Counts One through Seven would likely be admissible on the Government's direct case in a trial of Count Eight, to prove knowledge and intent. *See* Fed.R.Evid. 404(b); *United States v. Ruggiero,* 934 F.2d at 448–49. Defendant therefore fails to make the requisite particularized showing that he has important testimony to give as to Count Eight or that there are important reasons for remaining silent with respect to Counts One through Seven. Accordingly, defendant's motion for a severance of Count Eight of the indictment is denied.

## II. Production of Witness List

■ In support of his motion to compel the Government to produce a witness list in advance of trial, defendant contends that such disclosure

> will aid the defense in preparing for trial because it should reveal what employees

of Staples or Bay Banks are alleged to have relied on defendant's credit applications. This in turn will assist the defense in preparing for trial and in focusing on such issues as the materiality of any representations which are now claimed to have been fraudulently made. ... Disclosure of a witness list will enable defendant to determine which persons connected with DAC are claiming that his use of this credit line was unauthorized which, in turn, will enable defendant to prepare his defense based on his knowledge of his relationship to those individuals.

Def. Mem., at 5.

Rule 16 of the Federal Rules of Criminal Procedure "does not require the Government to furnish the names and addresses of its witnesses in general." *United States v. Bejasa,* 904 F.2d 137, 139 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990). Although the court has the power to compel pre-trial disclosure of the identity of the Government's witnesses in appropriate cases, the defendant must first make a " 'specific showing that disclosure [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case....' " *Id.* at 139–40 (quoting *United States v. Cannone,* 528 F.2d 296, 301 (2d Cir.1975)); *see also United States v. Taylor,* 707 F.Supp. 696, 703 (S.D.N.Y.1989) (court must balance defendant's need for disclosure against Government's interest in protecting identity, prior to trial, of prospective Government witnesses).

Defendant has failed to make any specific showing of his need for pre-trial disclosure of a witness list. Defendant's claim that such information will help him "focus" on the issue of the "materiality" of his alleged fraudulent statements, is wholly conclusory and insufficient to compel disclosure, especially in light of the Government's responses to defendant's request for a bill of particulars which detail the fraudulent misrepresentations which serve as the basis of Counts One through Six of the indictment. Defendant's claim that disclosure of the Government's witnesses is necessary in order to prepare his defense based on his knowledge of his relationship to individuals connected to DAC Medical Data Services is similarly conclusory. Defendant has indicated no reason why he could not adequately defend against the charge in Count Seven of the indictment upon learning the identities of the Government witnesses when they take the witness stand at trial. Moreover, by reason of his apparent prior association with DAC Medical Data Services, defendant already should be aware of the potential witnesses against him.

Accordingly, as defendant has failed to make any specific showing of his need for pre-trial disclosure of a witness list, and this is not a case in which the Government is withholding the identities of or access to witnesses whose presence at trial would surprise the defendant, *see United States v. Bejasa,* 904 F.2d at 140, defendant's motion to compel pre-trial disclosure of the Government's witness list is denied.

### III. Suppression of Post–Arrest Statements

Defendant alleges that his oral and written post-arrest statements were the product of improper coercion by Agents Mattiace and Harkins, in violation of his Sixth Amendment right to counsel, were therefore "involuntary," and therefore should be suppressed.

The law governing post-arrest questioning is well-settled. Prior to custodial interrogation, suspects must be advised of their right to remain silent and to the presence of an attorney. *Miranda,* 384 U.S. at 436, 86 S.Ct. at 1602. Of course, if a suspect requests counsel, all interrogation must cease until an attorney is present. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). The right to have counsel present during a post-arrest interview, however, may be waived if the waiver is "knowing, intelligent and voluntary." *United States v. Gotay,* 844 F.2d 971, 974 (2d Cir.1988); *see Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (the

State must prove a voluntary, knowing and intelligent relinquishment of the Sixth Amendment right to counsel); *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (same). As stated by the Second Circuit:

> the sixth amendment right to counsel can be knowingly and voluntarily waived by a criminal defendant who has been made fully aware of the nature of the right being abandoned and the consequences of the abandonment.

>     .     .     .     .     .

> Once an accused understands that he is under arrest, and, after receiving the *Miranda* warnings, understands his right to remain silent, the potential consequences of speaking, and his right to counsel, including during interrogation, he is fully apprised of the information needed to make a knowing waiver of the sixth amendment right . . . .

*United States v. Charria*, 919 F.2d 842, 846–88 (2d Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). The Government thus bears the burden of establishing, by a preponderance of the evidence, that the defendant's statement was voluntary, and was not the product of threats, violence or the exertion of improper influence or coercion. *See Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976); *Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991).

In assessing the voluntariness of a defendant's waiver of his Sixth Amendment right to counsel, the proper test is "whether the waiver . . . [was] 'the product of an essentially free and unconstrained choice by its maker.'" *United States v. Bye*, 919 F.2d 6, 8–9 (2d Cir.1990) (quoting *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973))). When conducting this inquiry, the court should consider "the totality of all the surrounding circumstances, which may include the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d at 99 (quoting *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047)); *see also United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir.1989) ("factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation' "), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984)).

▮ An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Moreover, a statement made by a defendant is not rendered "involuntary" merely because a law enforcement officer informed the defendant of the penalties he faced, *United States v. Alvarado*, 882 F.2d at 650; *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), that he would receive more lenient treatment if he cooperated, *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987), of the nature of the evidence against him, *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990), or of the possible sentence he would face and the benefits he would gain by cooperating. *United States v. Bye*, 919 F.2d at 9–10. Rather, "[r]egardless of whether the agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances . . . the defendant's will was overborne by the agent's conduct." *United States v. Anderson*, 929 F.2d at 99.

▮ The record in this case, including the credible and unimpeached testimony of Agents Harkins, Keating and Mattiace, indicates that defendant's waiver of his right to counsel was knowing, intelligent and voluntary.

Before making any oral or written statement, the defendant executed clear and unequivocal waivers of his right to counsel. Tr. at 6–8, 15–17, 29–30, 51, 57–58. Defendant expressed no difficulty or confusion in comprehending the waivers, Tr. at 8, 17 52, 58, and, prior to executing the first waiver form, commented to the Agents that he was familiar with his rights because "he works for a lawyer and ... is currently taking paralegal courses." Tr. at 6, 51. This is strong evidence that defendant acted knowingly and voluntarily when he executed the waivers. *See North Carolina v. Butler*, 441 U.S. at 373, 99 S.Ct. at 1757; *see also United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990) (court rejected Sixth Amendment challenge to admission of defendant's post-arrest statements where defendant "chose" to confront law enforcement officers without the assistance of counsel, where "at the time of arrest he had in his possession three telephone numbers for the attorney representing one of his co-defendants" but "[a]t no time did he attempt to obtain counsel for himself" or "have his wife contact an attorney in his behalf," where the defendant "expressed an understanding of his rights, indeed interrupted the Agent who advised him of his rights, to indicate both his familiarity with them and his determination to make his own decisions," and where the circumstances reveal a self-confident defendant who knew whether and when he wanted an attorney"); *cf. United States v. Isom*, 588 F.2d 858, 862 (2d Cir.1978) (district court's finding of voluntary waiver of Fifth Amendment right affirmed where defendant "expressed his understanding of his rights as they were read to him, signed the waiver of rights form, and had had rather considerable prior experience with law enforcement officers").

Moreover, notwithstanding defendant's averment that he "asked Agent Harkins for a lawyer," Broccolo Aff., at ¶ 5, the agents' credible testimony established that at no time did defendant request to speak to an attorney, despite the agents having given the defendant and his family every opportunity to do so. Specifically, at the time of defendant's arrest, Agent Keating gave defendant's father his business card with the location and telephone number of the F.B.I.'s New Rochelle headquarters and informed him that the Agents were taking the defendant there, Tr. at 47; and Agent Harkins permitted the defendant to telephone his family both times he asked to do so. Tr. at 12, 19–20, 54, 58. Despite the two telephone calls to family members, defendant, who lived with his parents and was admittedly familiar with the legal process, never asked family members to obtain an attorney for him.

Defendant avers that "[d]uring Agent Harkins questioning of me, I asked to make a telephone call, but he did not permit me to do so. It was my intention to telephone a lawyer." Broccolo Aff., at ¶ 6. Defendant also avers that although he was later permitted to make telephone calls, he telephoned family members rather than a lawyer, "because [he] thought it was too late, since [he] had already made a statement." *Id.* Significantly, these statements contain no indication that defendant ever *communicated to the agents* his "intention" to telephone a lawyer. As the right to counsel must be specifically invoked, *see Edwards v. Arizona*, 451 U.S. at 482, 101 S.Ct. at 1883–84, these statements fail to raise a factual issue with respect to defendant's claim that he was denied counsel. Viewed most favorably to defendant, such statements indicate the coincidence of two disjointed events: defendant's momentary, unarticulated intent to telephone a lawyer, and the agents' denial of defendant's request to make a telephone call. Moreover, according to defendant's own account of the event, his request to use the telephone came "[d]uring Agent Harkins' questioning," and therefore after defendant had signed one or both of the waiver of rights forms. Defendant's purported request to use the telephone, if credited, would therefore do little to support his claim that his waiver was involuntary. Similarly, in view of the agents' repudiation of defendant's claim that he requested but was denied counsel, the Court discounts defendant's decidedly vague averment that Agent Harkins "*implied* that [he] would lose the benefits of cooperating if [he] persisted in delaying the interrogation for the

arrival of a lawyer." Broccolo Aff., at ¶ 6 (emphasis added).

With respect to defendant's averment that "Agent Harkins told [him], in sum and substance, that if he did not immediately begin to answer questions, [he] could lose the opportunity to benefit from cooperating with the FBI," *id.* at ¶ 5, even if true such statement, without more, is insufficient to render defendant's statement "involuntary" given the totality of the circumstances of defendant's waiver. *See United States v. Alvarado,* 882 F.2d at 650; *United States v. Pomares,* 499 F.2d at 1222; *United States v. Guarno,* 819 F.2d 28, 31 (2d Cir.1987).

Finally, the conditions of the interrogation and conduct of the officers undermine any contention that defendant's "will was overborne." The agents gave uncontroverted and credible testimony that at no time while in the interview room was defendant handcuffed, defendant had stated to family members during a telephone call to them that he was being treated like a "gentleman," defendant was comfortable, and defendant dined, together with the agents, on pizza and soda. Tr. at 5, 56. Far from indicating circumstances which may have tended to overbear defendant's will to make a free and unconstrained choice whether to waive his right to counsel, the record indicates conditions of interrogation that were relaxed, perhaps even amicable, and as conducive to permitting a defendant to make a voluntary and thoughtful decision concerning waiver of his Sixth Amendment right as may be possible under circumstances of custodial arrest.

■ Although Agent Harkins acknowledges that he understood defendant to be represented by an attorney, Paul Squitieri, Esq., in several civil matters, and nevertheless continued to interrogate defendant, defendant's heavy reliance on this fact is misplaced. Under the law of this Circuit, in contrast to what had been the law of the State of New York during most of the last decade, *see People v. Bing,* 76 N.Y.2d 331, 559 N.Y.S.2d 474, 558 N.E.2d 1011 (1990)

(overruling *People v. Bartolomeo,* 53 N.Y.2d 225, 440 N.Y.S.2d 894, 423 N.E.2d 371 (1981) (a suspect, represented by counsel on a prior pending charge, may not waive his rights in the absence of counsel and answer questions on new unrelated charges)), a suspect has no indelible Sixth Amendment right to counsel which requires the presence of counsel in order for a waiver of such right to be recognized. Thus, in view of this Court's finding that defendant's waiver of his right to counsel was knowing, intelligent and voluntary, the agents' knowledge of Squitieri's representation of defendant in a number of civil[7] matters is irrelevant to a determination of whether defendant's post-arrest statements should be suppressed.

### CONCLUSION

For the reasons set forth above, defendant's motion for an order severing Count Eight from Counts One through Seven of the indictment, compelling the Government to disclose a witness list in advance of trial, and suppressing defendant's post-arrest statements, is denied.

SO ORDERED.

---

7. As the record contains no evidence to indicate that Squitieri represented defendant in connection with this or any other criminal matter,

even prior New York law would appear to provide no colorable basis for suppression.