UNITED STATES of America,

v.

Michael A. LaPORTA, Defendant.

No. 91–CR–290C.

United States District Court,
W.D. New York.

Nov. 18, 1992.

Dennis C. Vacco, U.S. Atty. (Anthony M. Bruce, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for U.S.

Joel L. Daniels, Buffalo, N.Y., for defendant.

## BACKGROUND

CURTIN, District Judge.

■ Defendant Michael LaPorta appeals the United States Magistrate Judge's denial of his motion to suppress his confession and recorded statements. He claims that he was stopped and detained without a warrant or probable cause. He moves to suppress the evidence obtained from him while he was being held in investigative custody in violation of his Fourth Amendment rights. The Magistrate Judge denied his motion, finding that the initial encounter between the defendant and the FBI agents was consensual and the subsequent confession and taped statements were voluntarily given. This court must make a *de novo* determination of the Magistrate Judge's recommendation.

The Magistrate Judge issued a detailed finding of facts which is reviewed briefly here to emphasize certain points.

### 1. Initial Stop

Two FBI agents waited outside LaPorta's garage until he left in his car. They followed him for several blocks before pulling him over, using a flashing red light and possibly a siren. They deliberately waited until he was alone to stop him. Tr. 9, 54. Agent Johnson walked up to the driver's side, introduced himself, showed his credentials, and asked LaPorta if he would come down to FBI Headquarters with them. Tr. 10. LaPorta replied, "Okay," and was given permission to lock his car. Tr. 10. He then climbed into the back seat of the FBI car, and Johnson sat down next to him. The agents never touched LaPorta, nor physically restrained him in any way. Tr. 103.

LaPorta was never informed that he was free to refuse to come with the agents. Tr. 58. Agent Johnson testified that he did not want to let LaPorta drive in his own car, because LaPorta might have changed his mind on the way and this would take things out of the agents' control. Tr. 63–64. Both agents were armed but never displayed their weapons. Tr. 92. A shotgun was on a rack inside the car in open view.

### 2. The Interview at Headquarters

The agents entered FBI Headquarters through a secured garage after hours, at about 6 p.m. They ushered LaPorta into a small conference room and shut the door. At this point, LaPorta had not yet been told why the agents wanted to talk to him, even though he had asked on the ride downtown.

In the conference room, Agent Johnson finally told LaPorta that the FBI felt there was enough evidence to indict him on charges of car-burning but wanted his cooperation in the investigation. He gave LaPorta information received from a cooperating witness and showed him a videotape. LaPorta refused to cooperate until the agents mentioned further evidence and went off the record. Eventually LaPorta signed the confession which he now seeks to suppress.

LaPorta's interview lasted about two hours. He remained in the conference room with the door shut with at least one agent present (Tr. 85), except when he was escorted to the restroom by Agent O'Connor. He was never told he was free to leave or given any type of *Miranda* warning. LaPorta never asked to leave (Tr. 103) or to stop answering questions, and he never asked for an attorney. Tr. 77. He only asked to telephone his wife, and was permitted to do so from the conference room. Tr. 76. He told her he would be delayed. Tr. 96.

The next day, LaPorta arranged to meet with the agents to be "wired" with a concealed tape recorder. LaPorta also seeks to suppress the tape made during his subsequent conversation with another suspect.

## DISCUSSION

■ The defendant moved to suppress his confession and his taped conversation with another suspect because they were illegally obtained in violation of his Fourth Amendment rights against unwarranted seizure. Stopping an automobile and detaining its occupant constitutes a "seizure"

within the meaning of the amendment, thereby requiring a warrant, even though the purpose of the stop is limited and the resulting detention is quite brief. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, a brief, warrantless detention is permissible "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). LaPorta argues that the FBI agents stopped his car and detained him for two hours without a warrant or probable cause. He had not been indicted for the offense they were investigating, and he had done nothing to give rise to a reasonable suspicion that he was currently engaged in any criminal activity.

■ The government contends that no Fourth Amendment seizure occurred; rather, LaPorta accompanied the FBI agents voluntarily. The test for what constitutes seizure is an objective one: whether in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Factors such as the display of a weapon, physical touching of the person by the officer, and language or tone indicating a show of authority all strongly suggest that compliance with the officer's request was compulsory. *Id.* at 554, 100 S.Ct. at 1877.

■ The government states that Agent Johnson merely approached LaPorta once he had pulled over and asked if he would mind talking to them. No weapon was displayed, and no one touched or restrained the defendant. Agent Johnson testified that if LaPorta had refused to talk to him, LaPorta would have been free to leave. This approach is likened to *United State v. Adegbite,* 846 F.2d 834 (2d Cir.1988), in which the Second Circuit found that plainclothes DEA officers who waved down a truck without displaying guns or badges did not use sufficient indicia of authority to convince reasonable persons that they were being detained. Unlike *Adegbite,* however, the agents in this case waited until the defendant was alone, stopped his car using a flashing red light and possibly a siren, and immediately identified themselves as FBI agents and displayed their badges. They asked LaPorta to accompany them and refused to divulge the purpose of the interview until they had arrived at Headquarters. While neither agent displayed a weapon, a shotgun was clearly displayed on the rack in the car. Agent Johnson testified that they wanted to approach LaPorta while he was by himself and bring him to Headquarters in their car in order to keep from "taking things out of our control." Tr. 63.

I find these circumstances would lead a reasonable person to believe that once he had been approached by the FBI and asked to come down to Headquarters with them, he was no longer free to leave. "When agents purposefully lead a suspect to believe that he is required to accompany them and without clear justification postpone questioning, ... they plainly exceed the bounds of *Terry.*" *United State v. Ceballos,* 812 F.2d 42 (2d Cir.1987).

■ Moreover, the confession and taped conversation must be suppressed because they were obtained as a result of investigative custody in which no *Miranda* warnings were given. "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). The mere fact that the questioning took place at Headquarters was not enough to make it an involuntary detention. *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Nor were the statements involuntary because LaPorta was not expressly told he did not have to cooperate. *Mendenhall, supra,* 446 U.S. at 555, 100 S.Ct. at 1877 (1980). Even a coercive atmosphere would not be enough to make the interview custodial. *United States v. Guarno,* 819 F.2d 28 (2d Cir.1987). However, when po-

lice begin questioning a suspect after depriving him of his freedom of action in any significant way, *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), mandates warning against self-incrimination.

The Magistrate Judge relied on *U.S. v. Guarno,* 819 F.2d 28 (2d. Cir.1987), in determining that the defendant was not in custody. The defendant in that case was also pulled over by FBI agents and asked to accompany them to answer questions. In a motel room, the defendant listened to the agents' evidence of his connection with criminal activities. He was informed that he was not under arrest and that he was free to consult a lawyer or to leave the motel room at any time. After two to three hours, he agreed to sign a confession. Three days later, he told the agents he did not wish to cooperate and subsequently moved to suppress his confession on the basis that he was never given his *Miranda* rights.

The *Guarno* court found that despite a degree of coercion in the agents' offer of leniency to Guarno in exchange for his cooperation, the confession was voluntary in light of all the relevant circumstances. However, the court was careful to point out that Guarno was "confronted by overwhelming evidence of guilt when the cooperation agreement was offered. Were the evidence more ambiguous, an issue might arise as to whether Guarno had been tricked into making an uncounselled confession." 819 F.2d at 31.

■ Unlike *Guarno,* LaPorta was taken to FBI Headquarters in an FBI vehicle escorted by two agents. He entered the building through a secure garage and was taken to a conference room. The door was shut, and he was never left alone. He was even accompanied to the restroom by Agent O'Connor. He was never told that he could leave at any time, that he did not have to talk to the agents, or that he could consult a lawyer. He was given permission to make a telephone call to his wife, but only in the presence of the agent. Unlike *Guarno,* he had no prior encounters with law enforcement personnel which would have made him more aware of his right to remain silent. Moreover, there is no indication in the record of the strength of the evidence against LaPorta.

LaPorta argues that *U.S. v. Ceballos,* 812 F.2d 42 (2d. Cir.1987), decided within months of *Guarno,* is a forceful precedent in his favor. In *Ceballos,* Secret Service agents went to the defendant's place of employment, told his supervisor they wanted to speak to him, and waited until he arrived. They showed him their badges and said, "Let's go down to the precinct." The agents refused to allow the defendant to follow them in his own car. While in the agents' car, the defendant was told what the investigation entailed and that he was not under arrest. He was also read his rights. The court suppressed the subsequent evidence seized by the agents because it found the defendant was placed in investigatory custody before there was probable cause to arrest him.

LaPorta's interview was also initiated by agents, who asked him to leave his car behind and go with them to Headquarters. Like *Ceballos,* he never asked to leave nor was he told he was free to go. Moreover, LaPorta was never read his rights. These circumstances combined to render his interview custodial, during which *Miranda* warnings should have been given.

## CONCLUSION

The agents stopped and detained LaPorta without a warrant or probable cause in violation of his Fourth Amendment rights. Once he was detained, they conducted an interview without affording him a *Miranda* warning. The resulting signed confession and taped incriminating statements were illegally obtained and are hereby suppressed.

Counsel shall meet with the court on November 20, 1992, at 9 a.m. to set a further schedule.

So ordered.